A03A1214. DEPARTMENT OF COMMUNITY HEALTH, DIVISION OF HEALTH PLANNING v. GWINNETT HOSPITAL SYSTEM, INC. et al.
A03A1215. EHCA, LLC et al. v. GWINNETT HOSPITAL SYSTEM, INC. et al.
A03A1216. EHCA, LLC et al. v. SAINT JOSEPH'S HOSPITAL OF ATLANTA, INC.
A03A1217. DEPARTMENT OF COMMUNITY HEALTH, DIVISION OF HEALTH PLANNING v. SAINT JOSEPH'S HOSPITAL OF ATLANTA, INC.
(586 SE2d 762)

BARNES, Judge.

These four cases involve appeals from two trial courts' decisions to reverse the grant of a hospital certificate of need (CON), which was issued by the Georgia Department of Community Health (the Department), Division of Health Planning (the Division). Because these cases all involve the same facts, we have consolidated them for review.

In November 2000, EHCA, LLC, and two of its affiliates, EHCA Dunwoody, LLC d/b/a Emory Dunwoody Medical Center and EHCA West Paces, LLC d/b/a West Paces Medical Center (EHCA), completed an application for a CON to build a hospital in Duluth, proposing to "relocate and consolidate" Emory Dunwoody and West Paces hospitals. Three other hospitals intervened and objected to the proposed CON: Saint Joseph's Hospital of Atlanta, Inc., Gwinnett Hospital System, Inc. d/b/a Gwinnett Medical Center, and Joan Glancy Memorial Hospital.[1]

The CON underwent three levels of administrative review. First, a Division analyst reviewed the application and approved it. The opponents appealed the decision to the State Health Planning Review Board (Board), which appointed a hearing officer to conduct a review. After conducting an eight-day hearing and reviewing the voluminous records presented by the parties, the hearing officer

---

[1] North Fulton Medical Center also intervened, but is not a party to this appeal.

issued a 21-page opinion containing forty-one findings of fact and affirming the Division's decision to issue the CON. The opponents again appealed, and the Board affirmed the hearing officer's decision, concluding that his findings of fact were supported by substantial evidence and that his conclusions of law were correct.

Gwinnett Medical Center and Joan Glancy Memorial appealed the Board's decision in Gwinnett County Superior Court, and St. Joseph's appealed it in Fulton County Superior Court. In October 2002, the Gwinnett court made 27 findings of fact and reversed the Board, concluding that its decision was arbitrary, capricious, and not supported by substantial evidence. A month later, the Fulton court made 20 findings of fact and also reversed the Board, concluding that the decision was arbitrary, capricious, exceeded the Division's statutory authority, and was not supported by substantial evidence. Both the Division and EHCA applied to this court for discretionary review, which we granted. For the reasons that follow, we reverse both trial courts' decisions.

In 1999, the legislature created the Department of Community Health to perform the functions previously performed by the Health Planning Agency, by the Department of Medical Assistance, and by the State Personnel Board with respect to the State Health Benefit Plan. OCGA § 31-5A-4. In describing its intent in creating this new department, the legislature recognized that "the manner in which health care is currently administered at the state level is fragmented and often unresponsive to health care issues." OCGA § 31-5A-1. Among other reasons, the Department was created "[t]o minimize duplication and maximize administrative efficiency in the state's health care systems by removing overlapping functions and streamlining uncoordinated programs," and "[t]o allow the state to develop a better health care infrastructure that is more responsive to the consumers it serves while improving access to and coverage for health care. . . ." OCGA § 31-5A-1 (3), (4).

The Department is thus charged with administering the State Health Planning and Development Act, OCGA § 31-6-1 et seq., "to create a system for planning new health service institutions to avoid costly duplication of services where insufficient need existed." *Albany Surgical v. Dept. of Community Health*, 257 Ga. App. 636 (572 SE2d 638) (2002). The legislative intent expressed in the Act is

> to ensure that adequate health care services and facilities are developed in an orderly and economical manner and are made available to all citizens and that only those health care services found to be in the public interest shall be provided in this state. To achieve this public policy and purpose, it is essential that appropriate health planning activities be

undertaken and implemented and that a system of mandatory review of new institutional health services be provided. Health care services and facilities should be provided in a manner that avoids unnecessary duplication of services, that is cost effective, and that is compatible with the health care needs of the various areas and population of the state.

OCGA § 31-6-1. Before it can establish new institutional services or health care facilities, an institution must apply to the Division for a CON, and the Division must determine that a need exists for the new services or facilities before issuing a certificate. OCGA § 31-6-40 (a), (b). The statute defines "new institutional health service" as, among other things, any capital expenditure over a certain amount, OCGA § 31-6-2 (14) (B), and institutions that want to relocate an existing facility must apply for and receive a CON. *Phoebe Putney Mem. Hosp. v. Roach*, 267 Ga. 619, 621 (480 SE2d 595) (1997).

Finally, the legislature has outlined the qualifications required for a CON, providing, "The [D]epartment shall issue a certificate of need to each applicant whose application is consistent with the following considerations and such rules deemed applicable to a project." OCGA § 31-6-42 (a). These 14 "considerations" include a showing that the facility is "reasonably consistent with the relevant general goals and objectives of the state health plan," that a need exists in the service area, that the facility is financially feasible, and that the proposed facility encourages "more efficient utilization of the health care facility proposing such service." Id.

The statute outlining the CON system is broad. In addition to outlining the procedure generally, the legislature directed the Division to prepare a draft state health plan, which was then submitted to the Health Strategies Council for adoption, and finally submitted to the governor for signature. OCGA § 31-6-21 (b) (2). The legislature also directed the Division "to adopt, promulgate, and implement rules and regulations sufficient to administer the provisions of this chapter including the certificate of need program." OCGA § 31-6-21 (b) (4). These rules and regulations, which were promulgated pursuant to OCGA §§ 31-6-21.1 and 50-13-4, provide further guidance on applying the directives of the statute to specific CONs.

The Division is responsible for interpreting and applying the statute, the state health plan, and its rules and regulations in order to fulfill its function as established by the legislature. See *St. Joseph's Hosp. v. Thunderbolt Health Care*, 237 Ga. App. 454, 457 (2) (517 SE2d 334) (1999) (physical precedent only). The legislature cedes this authority to the Division because the public is better served by having experts in the complexities of health care planning make these decisions. The issues are complicated, and the applicable

laws, rules, regulations, and precedents require much study, especially for a decision-maker who is not already familiar with them.

> [A]gencies provide a high level of expertise and an opportunity for specialization unavailable in the judicial or legislative branches. They are able to use these skills, along with the policy mandate and discretion entrusted to them by the legislature, to make rules and enforce them in fashioning solutions to very complex problems. Thus, their decisions are not to be taken lightly or minimized by the judiciary. Review overbroad in scope would have the effect of substituting the judgment of a judge or jury for that of the agency, thereby nullifying the benefits of legislative delegation to a specialized body.

*Bentley v. Chastain*, 242 Ga. 348, 350-351 (1) (249 SE2d 38) (1978).

Thus the "interpretation of a statute by an administrative agency which has the duty of enforcing or administering it is to be given great weight and deference." *Hosp. Auth. of Gwinnett County v. State Health Planning Agency*, 211 Ga. App. 407, 408 (2) (438 SE2d 912) (1993).

> Implicit in the interlocking parts of the statutory scheme is the legislative intent that the [Division] use the considerations [listed in OCGA § 31-6-42] as a base, filling the interstices of the statutory considerations with the agency's rules interpreting and implementing them. What was implicit in the statutory scheme has now been made explicit.

*North Fulton Community Hosp. v. State Health Planning &c.*, 168 Ga. App. 801, 804 (2) (310 SE2d 764) (1983).

In addition to giving deference to the Division's statutory interpretation and application of its own rules and regulations, we accept its factfinding if it is supported by substantial evidence. The CON statute grants an aggrieved party the right to seek judicial review of the Division's final decision in accordance with the methods set out in Chapter 13 of Title 50, the Administrative Procedure Act, OCGA § 50-13-19, but also specifies the judicial standard of evidentiary review. OCGA § 31-6-44 (m). The CON statute provides:

> [I]n conducting such review, the court may reverse or modify the final decision only if substantial rights of the appellant have been prejudiced because the procedures followed by the department, the hearing officer, or the review board or the administrative findings, inferences, and conclusions contained in the final decision are: (1) In violation of constitu-

tional or statutory provisions; (2) In excess of the statutory authority of the department; (3) Made upon unlawful procedures; (4) Affected by other error of law; (5) Not supported by *substantial evidence*, which shall mean that the record does not contain such relevant evidence as a reasonable mind might accept as adequate to support such findings, inferences, conclusions, or decisions, which such evidentiary standard shall be in excess of the "any evidence" standard contained in other statutory provisions; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

(Emphasis supplied.) Id.

Neither our review nor the trial courts' review of the Division's decisions is de novo. They are reviews made with deference to the factual findings of the hearing officer appointed by the Board to decide the case. Only if these findings are not supported by substantial evidence, as defined by the statute, can the reviewing courts reject them, and nothing in our law gives the reviewing courts the right to reconsider those factual findings and make factual findings of their own. Either they are supported by substantial evidence or they are not. Further, "our duty is not to review whether the record supports the superior court's decision but whether the record supports the final decision of the . . . administrative agency." (Citation and punctuation omitted.) *Sawyer v. Reheis*, 213 Ga. App. 727, 729 (1) (445 SE2d 837) (1994). Moreover, the superior courts cannot substitute their judgment for that of the hearing officer as to the weight of the evidence on questions of fact. *Emory Univ. v. Levitas*, 260 Ga. 894, 898 (1) (401 SE2d 691) (1991).

Finally,

[i]f arbitrary and capricious action is alleged the superior court must determine whether a rational basis exists for the decision made. This is a question of law. . . . By way of contrast to the "rational basis" standard of review, the term "arbitrary," as defined in the Standard Dictionary, means, "fixed or done capriciously or at pleasure; without adequate determining principle; not founded in the nature of things; non-rational; not done or acting according to reason or judgment; depending on the will alone; absolutely in power; capriciously; tyrannical; despotic."

(Citations and punctuation omitted.) *Sawyer v. Reheis*, supra, 213 Ga. App. at 729-730 (2).

With the proper standard of review in mind, we then look to the

specifics of the case before us. Both the Fulton and the Gwinnett Superior Courts reversed the Division. The courts found that the Division's decision granting the CON to EHCA was arbitrary, capricious, exceeded the Division's statutory authority, and was not supported by substantial evidence. While the orders of the two trial courts differ in some respects, both courts made numerous factual findings and held that the Division should have determined that EHCA was seeking to build a new hospital, rather than a replacement hospital. That distinction is critical, and the statute itself does not define what constitutes a "replacement" hospital.

The Division and EHCA contend on appeal that the trial courts erred in concluding that its decision to issue the CON was not supported by substantial evidence and exceeded its statutory authority. The Division also contends that the trial courts erred in concluding that the Division failed to apply the 12-month rule; in concluding that the Division failed to assess properly the relevant service area; in holding that a CON application for a replacement hospital must always be considered as one for a new hospital under *North Fulton Med. Center v. Stephenson*, 269 Ga. 540 (501 SE2d 798) (1998); in concluding that the Division's decision to issue a CON is contrary to the general considerations (Fulton); and in holding that the Perinatal Rule applies (Gwinnett).

1. *The 12-Month Rule.* The statute provides that services meeting certain criteria must apply for a CON. OCGA § 31-6-2 (20). One definition of "new institutional health service," for which a CON application is required, is services that were not offered within the 12-month period before the time such services would be offered. OCGA § 31-6-2 (14) (D). Both superior courts held that, based on this Code section, the Division should not have included the West Paces hospital beds in its calculations because it had been closed for more than 12 months by the time the CON was issued. EHCA and the Division contend on appeal that the superior courts erred in this conclusion because the statute does not define whether a proposed project is for a new facility or a replacement facility, but simply identifies which proposals trigger the application requirement.

The hearing officer made extensive findings of fact regarding this issue. He noted initially that EHCA owns five ambulatory surgery centers and seven hospitals throughout metropolitan Atlanta, all of which are located in State Health Planning Area 3. It is the second largest health care system in Georgia, and the Division "has repeatedly urged EHCA to begin acting like a unified healthcare system . . . to meet the goals of modern healthcare." EHCA proposed to consolidate and replace the 294-bed West Paces Medical Center and the 168-bed Emory Dunwoody Medical Center with a to-be-constructed 110-bed hospital.

The hearing officer further found that

> [t]he Division historically has exercised its authority to apply its rules in a flexible manner to address unusual situations and to best serve the health planning needs of the State. The Division considered EHCA's CON application unique. That is, never before had the Division been faced with a proposal to consolidate and replace two (2) existing acute care hospitals, both of which are located within the same health care planning area and part of the same health care system, into a single newly constructed replacement facility in the same planning area. According to former Commissioner Russell Toal, the project is an innovative proposal which recognizes some realities in the health care world.

In considering whether EHCA was entitled to include the West Paces facility in its proposal, the hearing officer looked at OCGA § 31-6-2 (14) (D), which defines "new institutional health service," as "[c]linical health services which are offered in or through a diagnostic, treatment, or rehabilitation center which were not offered on a regular basis in or through that center within the 12 month period prior to the time such services would be offered. . . ." While EHCA closed West Paces on December 9, 1999, its CON application was complete by November 3, 2000, and West Paces retained the right to reopen the facility on or before December 9, 2000. The hearing officer determined that "[t]he most logical application of the 12-month rule is as an inventory control mechanism[, which] allows the Division at any given time to determine its inventory or supply of services by removing services from its inventory that are not being offered any longer so other providers can apply for a CON to initiate the service."

Therefore, using the institution-specific bed need methodology, the hearing officer determined that Dunwoody showed a projected need for 54 beds and West Paces showed a need for 66 beds, or 120 beds total in 2005, enough to justify the proposed 110-bed facility. He further found that it is "virtually impossible to construct a hospital facility in fewer than 12 months." Because these circumstances are unique, not addressed by the statute, and distinguished factually from previous determinations involving the statute, the hearing officer concluded that EHCA was entitled to have the West Paces beds considered.

The Gwinnett court held that the Division "had to completely disregard" the 12-month rule to reach its decision, which was therefore arbitrary, capricious, and unsupported by substantial evidence. The Fulton court held that the decision to include the West Paces

beds was an arbitrary and capricious departure from long-established precedent. The record does not support these conclusions.

OCGA § 31-6-2 (14), the statute that includes the 12-month rule, does not establish the definitions and distinctions between "new" and "replacement" facilities to be applied after an institution applies for a CON. Instead, it defines situations in which an institution must apply for a CON in the first place. If a proposal meets the definition of a "new institutional health service" under OCGA § 31-6-2 (14), it is considered a "project" for which a CON is required. OCGA § 31-6-2 (20). The proposed facility in this case was already subject to the CON requirement because it involved a capital expenditure that exceeds the threshold amount (OCGA § 31-6-2 (14) (B)) and because it involved the construction of a new facility (OCGA § 31-6-2 (14) (A)), which triggers CON review whether it is a replacement or not. Even if we were to find that the proposal is for a "new institutional health service" because it involves services that were not offered within the previous 12 months under OCGA § 31-6-2 (14) (D), that finding would merely trigger the necessity of a CON application, not determine whether the application was for a new or replacement facility.

In considering the application of this statute, we must "look diligently for the intention of the General Assembly, keeping in view at all times the old law, the evil, and the remedy." OCGA § 1-3-1 (a). Thus the cardinal rule in statutory construction is to ascertain the legislature's intention and effectuate the purpose of the statute. *Five Star Steel Contractors v. Colonial Credit Union*, 208 Ga. App. 694, 696 (431 SE2d 712) (1993). The provisions of OCGA § 31-6-2 (14) establish when an institution must apply for a CON. To read it otherwise would mean that any proposed facility that meets the definition of "project," such as one that passed the threshold capital expenditure or involved new construction, would also automatically be considered "new," which would be an unreasonable construction. "Statutes must be construed as well so[ ] as to square with common sense and sound reasoning. It is the duty of the court to consider the results and consequences of any proposed construction and not so construe a statute as will result in unreasonable or absurd consequences not contemplated by the legislature." (Citation and punctuation omitted.) *City of Brunswick v. Atlanta Journal &c.*, 214 Ga. App. 150, 153 (3) (447 SE2d 41) (1994).

Therefore, we conclude that the trial courts erred in finding that the Division's interpretation of the 12-month rule in this context was arbitrary, capricious, and not supported by substantial evidence, and that the Division should have considered this application as for a new facility, not a replacement facility.

Our decision in *Chattahoochee Valley Home Health Care v. Healthmaster*, 191 Ga. App. 42, 44-45 (2) (381 SE2d 56) (1989), does

not require a different result. The issue in that case was whether an institution had to apply for a CON before it could offer home health care services. The State Health Planning Agency (SHPA) determined that it did not, because it would have been grandfathered in by providing services before a certain time period, if it had not been misdirected by state officials. We held that this determination constituted an improper exemption from the CON requirements and "a radical departure from the general rule that one is not justified in relying upon a misrepresentation of law." Id. at 45. In the case before us, no one is arguing that EHCA is exempt from obtaining a CON.

2. *Supreme Court of Georgia Precedent.* EHCA and the Division contend that the trial courts erred in holding that a CON application for a replacement hospital must always be considered as one for a new hospital under *North Fulton Med. Center v. Stephenson*, supra, 269 Ga. at 540. We agree that the trial courts erred in so holding. *North Fulton* is the last of several opinions that addressed two different regulations pursuant to which the Division's predecessor, the SHPA, first tried to exempt a facility from having to obtain a CON for a replacement facility, then issued the CON after the facility had already moved.

The Supreme Court did not hold that all replacement facilities had to be assessed as if they were new facilities. It held in *North Fulton Med. Center v. Roach*, 263 Ga. 814 (440 SE2d 18) (1994), that proposed replacement facilities must apply for a CON. It held in *HCA Health Svcs. of Ga. v. Roach*, 265 Ga. 501 (458 SE2d 118) (1995), that SHPA's relocation rule exempting ambulatory surgical centers from having to obtain a CON was an unconstitutional attempt to expand the statutory exemptions. Finally, it held in *North Fulton Med. Center v. Stephenson*, supra, 269 Ga. at 540, that the second SHPA regulation, allowing the facility to obtain a CON after it had moved, "conflicts with the Act's express legislative requirement that before any relocating health care facility commences operation, it must obtain a certificate of need." Id. at 540-541. The court further held that "SHPA acted beyond the scope of its administrative authority by creating a separate class of health care facilities that are not contemplated by the Act, and exempting that class from the regulations governing all other new facilities." Id. at 541.

As we addressed earlier in Division 1, no one in this case is arguing about whether EHCA needs a CON, and the trial courts erred in their application of *North Fulton* to this case.

3. *Relevant Service Area.* EHCA and the Division contend that the trial courts erred in concluding that the Division failed to assess properly the relevant service area. The opponents assert that the trial courts correctly applied the "ten-mile service area" rule. This rule, which applies to Short-Term Hospital Beds, provides that

"[s]ervice areas for short-stay hospitals . . . will be based on accessibility and utilization of an existing similar service to the population that is within 30 minutes driving time of the proposed service." Former Ga. Comp. R. & Regs. r. 272-2-.09 (8) (c) (2001). The Division uses a ten-mile radius to approximate a thirty-minute driving time.

Both courts found as a fact that the relevant service area of both the proposed facility and of the existing facilities was a ten-mile radius around the sites, that the service area around the proposed site was different from the service area around the existing facilities, and that therefore the proposed facility was "new." The Gwinnett court held that the Division historically used patient zip code origins to evaluate service area, and that the Division's countywide analysis of patient origin and service area was "unreasonable." Using its own method of evaluating patient origin and service area, the court concluded that the proposed facility was not a replacement hospital, and the Division's finding to the contrary was arbitrary, capricious, and without substantial evidence.

The Fulton court held that the Division had insufficient information to conclude that the service area of the proposed facility did not differ from the service areas of Dunwoody and West Paces, then applied its own analysis to determine that the service areas differed, and that therefore the proposed facility was a new and not a replacement hospital. The court thus held that the Division's finding that the service area was the same was arbitrary, capricious, and not supported by substantial evidence.

The testimony before the hearing officer made it clear that the Division is only *required* to consider the "service area" of a hospital as a ten-mile radius in reviewing CON applications for *new* hospitals, because new hospitals do not have an existing patient pool from which the service area may be determined. The Gwinnett hospitals' health care consultant confirmed that other factors may determine the service area of an existing facility. St. Joseph's expert testified that the service area for an existing hospital is defined by patients' origin data. Two experts who helped prepare this CON application testified that, while the ring analysis is one approach or one tool to use in determining the service area for an existing hospital, it was not the only approach, and no rule requires the Division to assess the service area of an existing facility that way. EHCA made these calculations by county rather than by zip code for several reasons: the state does not collect hospital patient discharge data by zip code, and zip codes from 25 counties would total almost 1,000, making an unwieldy database. Further, using a ten-mile radius analysis would not have made sense looking at the system as a whole. No specific language in the CON statute or ten-mile service area rule directs the determination of where a replacement facility may be relocated, and

that determination requires an analysis that involves a measure of subjectivity, in which the Division exercises some latitude.

The Division had been telling EHCA that it needed to act more like a system instead of a group of isolated facilities, and to that end EHCA looked at the 25-county service area of its seven metro Atlanta hospitals, determined that Fulton County beds were maldistributed, and identified a need in the northeast. In the Division opinion, the hearing officer noted that, while not contained in any written rules or policy statements, the Division used a three-prong test to evaluate two recent CON applications for replacement hospitals, considering: (1) whether the facility itself needed replacing; (2) whether it can be replaced on site; and (3) whether the replacement facility would serve substantially the same service area. This test recognizes that a change of location does not mean that the facility is not a replacement. Regarding the third criterion, the hearing officer found that the EHCA system has a 25-county service area, looking at the historical patient origin by county for the facilities. Seventy-nine percent of patients in West Paces and Dunwoody came from five counties: Fulton, DeKalb, Gwinnett, Cobb, and Forsyth, and EHCA projected that 79.4 percent of patients at its proposed Duluth facility would come from those same five counties. The officer further found that the market shares for the EHCA system as a whole would remain consistent before and after the proposed Duluth facility is built. Further, no new or expanded services will be offered at the Duluth facility.

Fragmented, unresponsive health care administration led the legislature to create this new Division in 1999 to serve as the lead planning agency for all health issues in the state and develop a better health care infrastructure. OCGA § 31-5A-1. The Division has urged EHCA to act more like one system instead of twelve separate entities, and this CON application proposing to consolidate two underperforming facilities furthers that aspiration by looking at EHCA's assets as a whole and considering how it can best use its resources to provide better health care for Georgians. While it is possible, as the superior courts have done, to analyze this data differently and come up with different conclusions, the Division's methods and conclusions are entitled to deference. See *American Med. Intl. v. Charter Lake Hosp.*, 186 Ga. App. 204, 206-207 (2) (366 SE2d 795) (1988).

> In determining whether a given application is consistent with the considerations set forth in [OCGA §] 31-6-42 and [the Division's] rules, the Board Majority was entitled to place more emphasis on one consideration than another absent some mandatory language to the contrary. [Cit.]

Moreover, such emphasis is entitled to great deference by a reviewing court.

*Medical Center v. State Health Planning Agency*, 219 Ga. App. 334, 338 (3) (464 SE2d 925) (1995) (physical precedent only). The Division is the expert in this very complex field, and we therefore find that the superior courts erred in reevaluating the service area issue and concluding that the Division's analysis was arbitrary, capricious, and had no substantial evidence to support it.

4. *General Considerations.* The Division and EHCA contend that the Fulton court erred in concluding that the Division's decision to issue a CON is contrary to the general considerations listed in OCGA § 31-6-42 (a). The 14 general considerations, as mentioned earlier in this opinion, include a showing that the facility is "reasonably consistent with the relevant general goals and objectives of the state health plan," that a need exists in the service area, that the facility is financially feasible, and that the proposed facility encourages "more efficient utilization of the health care facility proposing such service." OCGA § 31-6-42 (a) (1), (9). The Fulton court held that no need exists for a new hospital in Duluth, and that existing alternatives are available, applying OCGA § 31-6-42 and Ga. Comp. R. & Regs. r. 272-2-.08 (1) (b) (3).

The hearing officer found otherwise and made numerous factual findings in this regard. He found that no existing alternatives would be better than the proposed facility, and that numerous other benefits associated with the proposed facility would have a positive impact on the health care delivery system in the service area, including the repositioning of existing beds and services to areas of higher demand and population growth, enhancement of systemwide planning and service delivery with the EHCA system, reduction of excess hospital beds in Health Planning Area 3, and furthering of Emory medical education opportunities. Additionally, the hearing officer evaluated the evidence and concluded that both Gwinnett Medical Center and St. Joseph's had higher than average utilization rates; that the project was appropriately financed; that its charges would be lower than average in Health Planning Area 3; that the proposed facility has committed to devote three percent of adjusted gross revenues to indigent and charity care; that the construction costs were reasonable; and that the proposed facility has instituted activities to address the current nursing shortage, the existence of which cannot stop development. These findings are supported by substantial evidence in the record.

In his conclusions of law, the hearing officer held that the hospital opponents had the burden of proving that the Division analyst who granted the CON committed prejudicial procedural error or that

the CON application was inconsistent with the applicable standards and criteria. The hearing officer held:

> Based on all of the evidence in the record, the proposed new institutional health service is reasonably consistent with the relevant goals and objectives of the State Health Plan as set forth in Rule 272-2-.08 [(1)] (b) (1). The State Health Plan contemplates that hospitals should be planned, developed and operated on the basis of rational regional system[s] which provide access to appropriate levels of care without unnecessary duplication and that multi-institutional systems for the coordination and consolidation of inpatient care services should be developed as one part of a regionalized hospital system. This project accomplishes the kind of rational bed and service redistribution identified.

Based on Divisions 1 and 2 of this opinion, in which we held that the Division properly determined that this proposed facility was a replacement hospital rather than a new hospital, the Fulton court also erred in holding that the Division's decision is contrary to the general considerations.

5. *The Perinatal Rule.* Finally, the Division and EHCA contend the Gwinnett court erred in holding that the Perinatal Rule applies, under which the Division would have to analyze whether new perinatal services were needed. The officer found that the Perinatal Rule, Ga. Comp. R. & Regs. r. 272-2-.09 (5), does not apply here because the proposed facility was a replacement, not a new, hospital. Based on the foregoing Divisions 1 and 2, the Gwinnett court erred in holding that the Perinatal Rule applies.

*Judgments reversed. Andrews, P. J., and Adams, J., concur.*

DECIDED AUGUST 26, 2003 — 

*Thurbert E. Baker, Attorney General, Robert S. Bomar, Deputy Attorney General, Harold D. Melton, Isaac Byrd, Sidney R. Barrett, Jr., Senior Assistant Attorneys General, James D. Coots, Assistant Attorney General*, for Department of Community Health.

*Powell, Goldstein, Frazer & Murphy, Randall L. Hughes, Adrienne E. Marting, Charlotte A. Combre, John S. Rees*, for Gwinnett Hospital System, Inc.

*Nelson, Mullins, Riley & Scarborough, Jeffrey C. Baxter, Stanley S. Jones, Jr., Jennifer D. Malinovsky*, for EHCA, LLC.

*Kilpatrick Stockton, Alexander S. Clay, Ray & Sherman, John W.*

*Ray, James M. Sherman, Dawnmarie Rodziewicz,* for Saint Joseph's Hospital of Atlanta, Inc.
 *Dorough & Dorough, Kathy K. Dorough,* amicus curiae.